## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. 26-mj-8461-RMM

UNITED STATES OF AMERICA

v.

NEVARA BROWN AND
DEQUAN KENDALL FLEMING

Defendant.                    /

FILED BY_____*MEE*_____D.C.

**Jun 18, 2026**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

### CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared M. Strauss)?  ☐ Yes ☑ No

2. Did this matter involve the participation of or consultation with Magistrate Judge Eduardo I. Sanchez during his tenure at the U.S. Attorney's Office, which concluded on January 22, 2023? ☐ Yes ☑ No

3. Did this matter involve the participation of or consultation with now Magistrate Judge Marty Fulgueira Elfenbein during her tenure at the U.S. Attorney's Office, which concluded on March 5, 2024? ☐ Yes ☑ No

4. Did this matter involve the participation of or consultation with Magistrate Judge Ellen F. D'Angelo during her tenure at the U.S. Attorney's Office, which concluded on October 7, 2024?  ☐ Yes ☑ No

5. Did this matter involve the participation of or consultation with Magistrate Judge Yeney Hernandez during her tenure at the U.S. Attorney's Office, which concluded on April 2, 2026?  ☐ Yes ☑ No

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

BY: _____

ASSISTANT UNITED STATES ATTORNEY
Florida Bar No.
500 South Australian Avenue, Suite 400
West Palm Beach, Florida 33401
Tel:    (561) 820-8711
Fax:    (561) 820-8777
Email:

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

|  | |  |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| NEVARA BROWN, | ) | Case No.  26-mj-8461-RMM |
| and | ) | |
| DEQUAN KENDALL FLEMING | ) | |
|  | ) | |
| *Defendant(s)* | | |

FILED BY___ *MEE* ___D.C.

**Jun 18, 2026**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - West Palm Beach

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ June 18, 2026 _____ in the county of _____ Palm Beach _____ in the

_____ Southern _____ District of _____ Florida _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm *Brown only*   RM |
| 21 U.S.C. § 846 | Conspiracy to Possess with Intent to Distribute 50 grams or more of Methamphetamine *Both Defendents*   RM |
| 18 U.S.C. § 924(c) | Use and Possession of a Firearm in Furtherance of a Drug Trafficking Crime *Brown only*   RM |
| *18 USC §2* | *Aiding + abetting the §924(c) violation Fleming only*   RM |

This criminal complaint is based on these facts:

See Attached Affidavit

☑ Continued on the attached sheet.

*Complainant's signature*

Special Agent Allison Marti, ATF
*Printed name and title*

Sworn and Attested to me by Applicant by Telephone (FaceTime) pursuant to Fed. R. Crim. P. 4(d) and 4.1

Date: _____ 06/18/2026 _____

*Judge's signature*

City and state: _____ West Palm Beach, FL _____    Hon. Ryon M. McCabe, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION FOR A CRIMINAL COMPLAINT**

I, Allison Marti, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.  I am a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), assigned to the West Palm Beach Field Office. I have been employed as a Special Agent with ATF since September 2021. As part of my duties as a Special Agent, I am responsible for conducting investigations of violations of federal laws, including but not limited to, those pertaining to firearms, narcotics, and firearms trafficking. I have conducted and participated in numerous investigations involving, but not limited to, the illegal possession and "straw purchasing" of firearms, illegal possession and manufacturing of machineguns, firearms trafficking, narcotics trafficking, and possession of a firearm in furtherance of narcotics trafficking.

2.  Your affiant makes this Affidavit in order to establish probable cause to believe that, in the Southern District of Florida:

a)  Nevara BROWN ("BROWN") did knowingly possess a firearm as a convicted felon in violation of Title 18, United States Code § 922(g)(1), conspire to possess with intent to distribute 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers in violation of Title 21, United States Code § 846 and 841(b)(1)(A), and use and carry a firearm during and in relation to a drug trafficking crime in violation of Title 18, United States Code 924(c).

b)  Dequan FLEMING ("FLEMING") conspired to possess with intent to distribute 50 grams or more of methamphetamine, its salts, isomers, and salts of its isomers or 500 grams or

more of a mixture or substance containing a detectable amount of methamphetamine, its salts, isomers, or salts of its isomers in violation of Title 21, United States Code § 846 and 841(b)(1)(A), and use and carrying of a firearm during and in relation to a drug trafficking crime in violation of Title 18, United States Code 924(c).

3.   The statements contained in this Affidavit are based on my personal knowledge, as well as information provided by other individuals, including other law enforcement officials and my review of records and other evidence obtained during the course of this investigation. I have included only those facts that I believe are necessary to establish probable cause in support of an arrest warrant.

## PROBABLE CAUSE

### Controlled Purchase of a Firearm from Nevara BROWN – May 26, 2026

4.   In or around May of 2026, at the direction of law enforcement, a documented ATF Confidential Informant that has been deemed credible ("CI"), exchanged communications with BROWN to arrange the purchase of firearms from BROWN to take place on May 26, 2026. BROWN agreed to conduct the purchase at the Tiger Food Market, located at 2501 President Barack Obama Highway, Riviera Beach, Florida, in the Southern District of Florida. All phone and text communications were preserved.

5.   On or about May 26, 2026, in the evening hours, ATF UC and ATF CI, equipped with audio/video recording equipment and ATF Investigative Funds, arrived at the Tiger Food Market, located at 2501 President Barack Obama Highway, Riveria Beach, Florida. Upon arrival, ATF UC and CI parked the Undercover Vehicle ("UCV") and the CI alerted to two (2) black males standing in front of the store. The CI stated that the black male with "short hair" was Nevara BROWN. The UC and CI exited the UCV, approached the two (2) black males, and greeted BROWN. The UC,

CI, BROWN, and the other black male (hereinafter referred to as "B.P.") entered the store and walked to the back near the beverage cooler.

6. Once inside the store, BROWN told UC and CI that one of the firearms was currently unavailable. BROWN then motioned to B.P. who produced a black pistol from his front pants pocket. B.P. handed the firearm to UC after the UC requested to inspect it. The UC identified it as a Glock pistol. UC asked if there was a round of ammunition in the chamber to which B.P. stated there was. While inspecting the firearm, UC removed the magazine and observed it was loaded with several rounds. UC asked for the price of the firearm to which B.P. stated it would be $800.00. UC stated he was surprised because the previous agreed upon price was $400.00. BROWN stated that the $400.00 firearm was not available. UC agreed to pay $800.00 as long as future purchases were more reasonable. Both BROWN and B.P. agreed to this and BROWN stated he would get with an associate and acquire additional firearms for the UC at a more reasonable price. UC paid B.P. $800.00 in ATF Investigative Funds. During the payment, BROWN made statements to the UC and CI that BROWN and B.P. are free to conduct their criminal activity in the store without fear of repercussion from the store owner. Shortly after, UC and CI returned to the UCV and departed the deal location.

7. After the completion of the deal, further examination of the firearm was conducted and it was determined to be a Glock, Model 48, 9mm caliber pistol, bearing serial number: BZWE7978 (frame) and serial number: CBSV036 (slide). The firearm had a live round in the chamber, and the magazine was loaded with additional rounds of ammunition, for a total of nine (9) rounds of 9mm caliber Speer ammunition. An ATF Special Agent with specialized training to determine interstate commerce nexus of firearms and ammunition examined the firearm and ammunition and determined that based on their training and experience, the pistol and ammunition were not

manufactured in the State of Florida and traveled in interstate and/or foreign commerce. A records check of the National Crime Information Center indicates that the slide bearing serial number: CBSV036 was confirmed to be stolen.

### Controlled Purchase of Firearms from Nevara BROWN– June 1, 2026

8.   In or around May 31, 2026, UC exchanged communications with BROWN to arrange the purchase of two (2) firearms from BROWN to take place on June 1, 2026. All phone conversations were audio preserved and all text communications were preserved.

9.   On or about June 1, 2026, in the late morning hours, ATF UC, equipped with audio/video recording equipment and ATF Investigative Funds, arrived at the Tiger Food Market, located at 2501 President Barack Obama Highway, Riveria Beach, FL. Upon arrival, ATF UC parked in front of the store and waited for BROWN. A short time later, BROWN called UC indicating that he had arrived. BROWN also said that there was a suspicious black sedan at the gas station across the street, furthering that he thinks it might be law enforcement. UC asked what BROWN wanted to do, BROWN told UC to get into BROWN's vehicle for the deal. UC exited the UCV and walked to meet BROWN, who was outside of his vehicle, they then walked together and entered BROWN's vehicle.

10. Once inside BROWN's vehicle, BROWN reached down toward the floorboard and produced two (2) pistols. BROWN made a comment that he intended to give UC a good deal for the firearms. BROWN sold both pistols to UC for $1,100.00 of ATF Investigative Funds. UC provided an extra $100.00 to BROWN for holding onto the firearms for an extra day until the UC could meet BROWN to buy them. In total, UC paid BROWN $1,200.00 in ATF Investigative Funds. During this transaction, UC and BROWN discussed the possibility of completing a transaction of Machinegun Conversion Devices ("MCDs"). BROWN stated he had an associate

who was able to obtain some MCDs and that he would sell them to UC for a reasonable price. UC exited BROWN's vehicle with the understanding that BROWN would reach out to UC later that day for the sale of MCDs. UC returned to the UCV and departed the deal location.

11. After the completion of the deal, further examination of the firearms was conducted and determined that one firearm was a Glock, Model 27, .40 caliber pistol, bearing serial number: WEW405. The firearm had a live round in the chamber, and the magazine was loaded with additional rounds of ammunition, for a total of six (6) rounds of .40 caliber Federal ammunition. The second firearm was a Taurus, Model GX4, 9mm pistol, bearing serial number: 1GA26573. The firearm had a magazine that was loaded with ten (10) rounds of 9mm Hornady ammunition. An ATF Special Agent with specialized training to determine interstate commerce nexus of firearms and ammunition examined the firearms and ammunition and determined that based on their training and experience, the pistol and ammunition were not manufactured in the State of Florida and traveled in interstate and/or foreign commerce. A records check of the National Crime Information Center indicates that the Taurus bearing serial number: 1GA26573 was confirmed to be stolen.

**Controlled Purchase of a Firearm from Nevara BROWN – June 5, 2026**

12. In or around June 2026, UC exchanged communications with BROWN to arrange the purchase of one (1) firearm from BROWN to take place on June 5, 2026. All phone conversations were audio preserved and all text communications were preserved.

13. On or about June 5, 2026, in the early afternoon hours, the ATF UC, equipped with audio/video recording equipment and ATF Investigative Funds, arrived at the Tiger Food Market, located at 2501 President Barack Obama Highway, Riviera Beach, FL. Upon arrival, ATF UC observed BROWN standing in front of the store with two unidentified black males and the ATF

CI. It should be noted that UC was aware that the ATF CI would be at the deal location prior to UC arriving. UC parked the UCV in the parking lot and approached the front of the store. After some conversation with BROWN and CI, BROWN and UC entered the UCV.

14. Once inside the UCV, BROWN and UC engaged in conversation. BROWN eventually removed a black crossbody bag from his person and began to open it. BROWN produced a black pistol, handed it to UC, and made statements of how much he liked the firearm and considered keeping it for himself. UC inspected the firearm, removing the magazine and noting that the magazine was loaded with ammunition and that there was a live round of ammunition in the chamber. UC inquired about the price and UC and BROWN came to the agreement of $650.00. UC expressed their appreciation of BROWN holding onto the firearm until UC could purchase it and UC provided BROWN with an additional $100.00. UC handed BROWN $760.00 (UC did not have denominations smaller than $20.00) in ATF Investigative Funds. UC and BROWN started talking about New York and BROWN stated how it's so hard to get firearms up there and that they are so strict about firearms. UC then states that he charges people in New York more for firearms and they know it's coming from a southern state because of the price. UC states that UC doesn't care if the firearm has a "body on it" (meaning the firearm has been used in a shooting and/or homicide) and that once UC knows if it does, UC will then know which way to push the firearm (meaning where to send the firearm to be sold). BROWN acknowledged the UC's comment and stated that he was a member of the Bloods gang and his gang affiliates in New York consistently asked him to send firearms north.

15. BROWN and UC engaged in further conversation and BROWN stated that he was going to be getting his Commercial Drivers License (CDL) soon. UC said that once he gets his CDL and a truck, BROWN can put anything in the back and be up and down the highways. UC said once

BROWN has items in the truck, he can pack up his own stuff (insinuating firearms) and package them up in boxes and clothes and no one will find it. BROWN affirmed UC's comments. UC asked how much longer BROWN had until he got his CDL to which BROWN said a few weeks. UC and BROWN continued to engage in conversation and then a short time later, exited the UCV and returned to the front of the store. UC, CI, and BROWN engaged in additional conversation and then UC returned to the UCV and departed the deal location.

16. After the completion of the deal, further examination of the firearm was conducted and determined that the firearm was a Smith and Wesson, Model M&P 9 Shield Plus, 9mm pistol, bearing serial number: JHB6319. The firearm had a live round in the chamber, and the magazine was loaded with additional rounds of ammunition, for a total of eleven (11) rounds of 9mm Speer ammunition. An ATF Special Agent with specialized training to determine interstate commerce nexus of firearm and ammunition examined the firearm and ammunition and determined that based on their training and experience, the pistol and ammunition were not manufactured in the State of Florida and traveled in interstate and/or foreign commerce. A records check of the National Crime Information Center indicated that the Smith and Wesson was confirmed to be stolen.

**Controlled Purchase of a Firearm from Nevara BROWN– June 9, 2026**

17. In or about June 9, 2026, UC exchanged communications with ATF CI, who was with BROWN at the time of the communications, to arrange the purchase of one (1) firearm from BROWN to take place on June 9, 2026. During the communication with CI and BROWN, it was learned that BROWN was in possession of a firearm that BROWN claimed was fully automatic. All phone conversations were audio preserved and all text communications were preserved.

18. On or about June 9, 2026, in the early afternoon hours, the ATF UC, equipped with audio/video recording equipment and ATF Investigative Funds, arrived at the Tiger Food Market,

located at 2501 President Barack Obama Highway, Riviera Beach, FL. Upon arrival, ATF UC observed CI and BROWN standing outside the store. UC parked the UCV and approached CI and BROWN. UC asked BROWN if he had any firearms in his possession and BROWN made a head motion towards the UCV and began walking towards the UCV. UC and BROWN got into the UCV and engaged in conversation about firearms. BROWN then produced a tan Glock pistol from his person, UC noted that the magazine well was empty. UC stated that he had to do a lot of convincing in order for his brother to agree to sell the firearm. UC asked BROWN if the firearm's firing pin had been modified because of the previous conversation of the firearm being potentially fully automatic. BROWN replied that it was modified. BROWN then stated that his brother wanted $1,500.00 for the firearm. Some negotiations started between UC and BROWN but ultimately UC agreed to pay $1,500.00. During the negotiations, BROWN reiterated that the firearm functioned like a fully automatic firearm. BROWN repeatedly stated that the firearm would discharge multiple rounds when the trigger was pressed.

19. BROWN went on to say that his brother was supposed to arrive at the store to provide the magazine for the firearm. UC observed a red Chevrolet SUV pulling into the parking lot and then BROWN received a phone call, identified it as his brother, and exited the UCV. UC observed BROWN walking over to the passenger side of the red Chevrolet SUV. A short time later, BROWN returned to the UCV and retrieved a tan magazine wrapped in a tan napkin from his right jacket pocket. UC handed $1,500.00 in ATF Investigative Funds to BROWN and UC requested to see the magazine, which BROWN handed to UC. UC observed the magazine and noted several rounds of ammunition were loaded into the magazine. UC then checked the pistol and noted that there was one (1) round of ammunition in the chamber. CI entered the rear of the UCV and UC,

CI, and BROWN engaged in general conversation. A short time later, BROWN and CI exited the UCV and UC departed the deal location.

20. After completion of the deal, further examination of the firearm was conducted and determined the firearm was a Glock, Model 19X, 9mm pistol, bearing serial number: CBPH239. The firearm had a live round in the chamber, and the magazine was loaded with additional rounds of ammunition, for a total of thirteen (13) rounds of assorted 9mm ammunition. An ATF Special Agent with specialized training to determine interstate commerce nexus of firearms and ammunition examined the firearm and ammunition and determined that based on their training and experience, the pistol and ammunition were not manufactured in the State of Florida and traveled in interstate and/or foreign commerce. A records check of the National Crime Information Center indicates that the Glock was confirmed to be stolen.

**Meetings to Discuss Armed Protection – June 11 and 15, 2026**

21. In or around June of 2026, an ATF CI met with BROWN and one of BROWN's associates at a carwash in Riviera Beach, Florida. During the meeting CI noticed that BROWN was armed. BROWN and his associate informed CI that they "handle business" with "tools" (CI understood this to mean that they conduct criminal activity with firearms). BROWN went on to tell CI that if anyone needed some business handled, to let them know.

22. On or about June 11, 2026, in the late afternoon hours, the ATF UC, equipped with audio/video recording equipment, arrived at the Tiger Food Market, located at 2501 President Barack Obama Highway, Riviera Beach, FL. Upon arrival, UC observed BROWN, his associate, and CI standing in front of the store. Once UC parked the UCV, UC approached all the individuals, greeted them, and then all got into the UCV. UC explained to BROWN and his associate that UC intended on purchasing narcotics in the near future. UC further explained that it was UC's first-

time doing business with these individuals and didn't want to conduct the transaction alone and risk being robbed since UC would be arriving with a lot of money. UC told BROWN and his associate that UC was intending to purchase several pounds of methamphetamine and would like BROWN and his associate to protect UC. UC told BROWN and his associate that UC would pay them for providing protection. BROWN told UC that he would provide protection for the UC but didn't need to be paid. UC continued to say that UC's main concern was whoever was there for the transaction needed to be able to handle things if the situation turned violent. UC told BROWN and his associate that the deal would be likely to take place on Thursday June 18. UC asked if BROWN's associate would participate and his associate said that he would participate if BROWN participated.

23. A short time later, BROWN's associate exited the UCV with CI and BROWN remained in the UCV. Once it was only UC and BROWN, BROWN stated that if his associate was going to participate, that he wasn't. BROWN went on to say that his associate didn't have access to firearms and that he "talks too much". UC agreed that he would not include BROWN's associate in any further discussions about the armed protection of the methamphetamine purchase. UC and BROWN agreed to speak more at a later time. BROWN exited the UCV and the UC departed the meeting location.

24. On or about June 15, 2026, in the later afternoon hours, the ATF UC, equipped with audio/video recording equipment, arrived at the Tiger Food Market, located at 2501 President Barack Obama Highway, Riviera Beach, FL. Upon arrival, UC observed a silver Hyundai sedan parked in the parking lot and observed the passenger door partially open with BROWN sitting inside preparing to exit the vehicle. Once the UCV was parked, BROWN exited the silver Hyundai and entered the passenger seat of the UCV. BROWN and UC engaged in general conversation and

then UC confirmed to BROWN that UC intended to purchase the previously discussed methamphetamine on Thursday June 18. UC told BROWN that UC's cousin would be present for the transaction and that UC intended to purchase six kilograms of methamphetamine on Thursday. UC told BROWN that the sellers would also have their own protection for the transaction. UC then told BROWN that UC, UC's cousin, BROWN, and BROWN's associates would meet on Thursday prior to the meeting with the methamphetamine sellers.

25. UC asked BROWN how he was feeling about the situation and asked BROWN about the ballistic vests BROWN referenced during an earlier phone call. BROWN replied that his brother had several ballistic vests and proceeded to describe them. BROWN then said that him and his brother came to the conclusion that they would need three total people to adequately protect UC. UC told BROWN that he will pay BROWN and his team after the methamphetamine purchase for the possibility that the situation could turn violent. BROWN and UC agreed that BROWN would be coming with two other individuals and that UC would pay BROWN $3,000.00 to which BROWN can then disperse to the other members of his team. UC reiterated that UC didn't want to ask BROWN and his team to do something they didn't want to do but BROWN confirmed that him and his team were good with providing protection for the UC during the methamphetamine purchase. UC and BROWN engaged in general conversation and then BROWN exited the UCV and UC departed the meeting location.

### Armed Protection Scenario – June 18, 2026

26. On or about June 18, 2026, an ATF Undercover Agent ("UC-1"), exchanged communication with BROWN to organize the protection of a simulated drug transaction. On the date of the meeting, UC-1 and BROWN exchanged recorded text messages and phone calls to

discuss when they would meet and the pre-determined meeting location which was 8115 Southern Blvd, West Palm Beach, Florida in the Southern District of Florida.

27. After UC-1 arrived at the meeting location he contacted BROWN who stated he was 20 minutes out. After some time had passed, BROWN and an unknown individual (later identified as Dequan FLEMING, hereinafter referred to as "FLEMING") arrived in a white Toyota Camry bearing Florida License Plate: "XMA478". BROWN and FLEMING called UC-1 and stated they were in the Burger King parking lot next to the pre-determined location. UC-1 exited the UCV and greeted BROWN and FLEMING as they exited the Toyota Camry. BROWN grabbed a backpack prior to entering the UCV. UC-1 could see the end of an AR-pistol sticking out of the backpack. BROWN and FLEMING then entered the rear of the UCV. UC-1 asked FLEMING if BROWN had explained what UC-1 was requesting from them. FLEMING stated no. UC-1 informed FLEMING that they would be providing armed protection while UC-1 was conducting a six (6) pound narcotics transaction to which FLEMING agreed. UC-1 asked again if they were all good and that UC-1 wanted to make sure he wouldn't get robbed. FLEMING responded "we good" to UC-1's remarks. UC-1, BROWN, and FLEMING then all traveled to an ATF controlled location to conduct the narcotics transaction.

28. Once UC-1, FLEMING, and BROWN arrived, they greeted UC-2, who was already at the location. BROWN then sat down in a chair to the left of the table where the narcotics transaction would be happening. BROWN was armed with an AR-pistol style firearm that was sitting in his lap. FLEMING stood at the entrance of the structure. UC-2 then placed a phone call to additional undercover ATF personnel posing as narcotics sellers. Upon their arrival, the ATF undercover sellers spoke with UC-2 regarding additional narcotics transactions to include the methamphetamine, specifically the weight, being purchased during this meeting. The undercover

sellers then contacted ATF undercovers posing as narcotics couriers to bring the six (6) pounds of methamphetamine to the deal location. Shortly after, the undercover courier arrived at the deal location and provided undercover seller with a bag containing the six (6) pounds of methamphetamine. Undercover seller took the bag containing six (6) pounds of methamphetamine and removed it to show UC-1 and UC-2. During that time the six (6) pounds of methamphetamine were able to be observed by all people inside the undisclosed location. ATF undercover seller then placed the methamphetamine on a digital scale and weighed the narcotics, which again was seen by all people in the undercover location. UC-1 and UC-2 then placed a call to ATF CI and an ATF undercover posing as UC-1's courier. CI and undercover courier arrived at the undercover deal location and provided $12,000.00 in ATF Investigative Funds to UC-1 and UC-2. At this time, six (6) pounds of methamphetamine and the $12,000.00 in ATF Investigative Funds were exchanged between UC-2 and the undercover sellers. It should be noted that the entirety of the transaction listed above was observed by BROWN and FLEMING. After the simulated transaction, both couriers and CI who were again in possession of the six (6) pounds of methamphetamine and $12,000.00 in ATF Investigative Funds, left the deal location.

29. After the deal had concluded, BROWN made comments to UC-1 that he wanted in on the further sale of the purchased narcotics. UC-1 then provided $2000.00 in ATF Investigative Funds to BROWN for protection during the transaction. UC-1 and BROWN had originally agreed on $3000.00, so UC-1 and UC-2 exited the undisclosed location in order to retrieve the additional $1,000.00. Upon exiting the undisclosed location, BROWN and FLEMING were taken into custody by members of the Palm Beach County Sheriff's Office. The firearm that was utilized during the transaction was American Tactical, Model Omni, Multi caliber pistol, bearing serial

number: NS424090 with an attached magazine containing thirty-one (31) rounds of 5.56 caliber assorted ammunition.

30. A records check of the National Crime Information Center indicates that BROWN was previously convicted of a felony in Palm Beach County Florida under Florida court case #502022CF001611AXXXMB on or about January 5, 2023, for Felon in Possession of a Firearm or Ammunition by Gang-Related Felon or Delinquent.

## CONCLUSION

31. Based on the foregoing facts, I respectfully submit that there is probable cause to believe that the aforementioned violations exist.

**FURTHER YOUR AFFIANT SAYETH NAUGHT.**

Respectfully submitted,

Allison Marti, Special Agent
Bureau of Alcohol, Tobacco, Firearms and
Explosives (ATF)

Attested to by the applicant in accordance with
the requirements of Fed. R. Crim. P. 4.1 by
FaceTime, on this /8 day of June 2026, at
West Palm Beach, Florida

HONORABLE RYON M. MCCABE
UNITED STATES MAGISTRATE JUDGE